IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| MAJID ABDULLA AL JOUDI, *et al.*, ) | |
| ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-0301 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Respondents. ) | |
| _____) | |
| JARALLAH AL-MARRI, *et al.*, ) | |
| ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 04-2035 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Respondents. ) | |
| _____) | |
| MUHAMMAD AL-ADAHI, *et al.*, ) | |
| ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 05-280 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, *et al.*, ) | |
| ) | |
| Respondents. ) | |
| _____) | |

|                                                                    |   |
|--------------------------------------------------------------------|---|
| HAMID AL RAZAK,, *et al.*,                                         | ) |
|                                                                    | ) |
|                                                                    | ) |
| Petitioners,                                                       | ) |
|                                                                    | ) |
| v.                                                                 | ) |
|                                                                    | ) |
| GEORGE W. BUSH,                                                    | ) |
| President of the United States, *et al.*,                         | ) |
|                                                                    | ) |
| Respondents.                                                       | ) |

Civil Action No. 05-1601 (GK)

## DECLARATION OF JOHN S. EDMONDSON, M.D.

Pursuant to 28 U.S.C. § 1746, I, John S. Edmondson, hereby declare:

1.    I am a Captain in the United States Navy with 25 years Active Federal Commissioned Service. I currently am the Commander, US Navy Hospital, Guantanamo Bay, Cuba and also serve as the Task Force Surgeon for Joint Task Force-Guantanamo, Guantanamo Bay, Cuba (JTF-GTMO). I am directly responsible for the medical care provided to personnel living at Guantanamo Bay and oversee the operation of the detention hospital that provides medical care to the detainees being held at Guantanamo. Currently, there are in excess of 500 detainees being held at the detainee camp at Guantanamo Bay, Cuba.

2.    I received my medical degree from the Medical College of Georgia. I completed an Internship at Bethesda Naval Hospital and a Residency in Emergency Medicine at Naval Hospital San Diego. I am licensed to practice in California and Georgia. I have held teaching appointments at the University of California San Diego and the Uniformed Services University of the Health Sciences in Bethesda.

3.    As the supervisor in charge of the detention hospital for JTF-GTMO, I regularly visit the detention hospital and I am in contact with the physician who is the Officer-in-Charge of the

2

detention hospital many times daily. I have personal knowledge of the procedures that are in place

for the operation of the detention hospital and I am responsible for ensuring they are followed. I

have personal knowledge of, or have received information in the course of my responsibilities

concerning, the matters related to the allegations made by petitioners' counsel in their September 28,

2005 motion to compel access to counsel and the exhibits submitted with it.

4.    There are procedures and/or protocols for providing medical care to detainees

including those detainees who may be participating in a hunger strike. The framework for these

procedures are set forth in the JTF-GTMO Standard Operating Procedures, the orders of JTF

Commander, Major General Jay Hood, and the orders of higher military and medical authorities.

These procedures were generally set forth in the declaration of Major General Hood previously

submitted in these cases. These orders and procedures establish the practices to be followed at all

times by all medical personnel at the detention hospital and throughout JTF-GTMO.

5.    No patient at the detention hospital receives any medical treatment, to include the

insertion of nasogastric tubes, feeding through those tubes, the administration of medication and the

hydration of patients from anyone other than a physician or a credentialed registered nurse. While

medical corpsmen may assist in a procedure, none of the above-listed medical procedures are

performed or have ever been performed by medical corpsmen, physician assistants or anyone other

than these medical professionals. This practice equals or exceeds the standard of care available at

accredited hospitals in the United States.

6.    When inserting nasogastric tubes, a lubricant is always used. In all cases, a topical

anaesthetic such as lidocaine is offered; however, a patient may decline the anaesthetic. A sterile

nasogastric tube is lubricated with a gel that contains lidocaine, a widely used local anaesthetic, or

surgilube prior to its insertion by the medical professional. In rare cases, cetacaine, an oral spray,

3

may also be used. Sedation, which creates greater risks to the patient, has never been required to accomplish a nasogastric tube insertion. A nasogastric tube is never inserted and moved up and down. It is inserted down into the stomach slowly and directly and it would be impossible to insert the wrong end of the tube. I have personally performed this insertion procedure for some of the hunger-striking patients. Medical personnel do not insert or administer nasogastric tubes in a manner intentionally designed to inflict pain or harm on the detainee.

      7.     Contrary to petitioner's counsel's assertions, no detainee participating in the hunger strike has ever been placed in six-point restraint to receive intravenous medication. Only rarely are detainee patients unwilling to have the nasogastric tubes inserted. On only one occasion has a detainee patient been placed in a six-point restraint to receive a nasogastric tube and within minutes of placement the restraint level was reduced to two-point restraint, which would allow the detainee to remove the tube if he chose. In less than ten cases have trained medical personnel had to use four-point medical restraint in order to achieve insertion. Guards have never inserted, removed or even touched nasogastric tubes. When any of these medical restraints are necessary, only soft Velcro restraints are used. Virtually all of the detainee patients accept insertion of nasogastric tubes without any additional restraints.

      8.     Current protocols require that a new sterile nasogastric tube be utilized for every insertion. An earlier protocol used in the detention hospital allowed a sanitized feeding tube to be reused for the same detainee only, however that protocol, although consistent with standard, approved medical practice, was changed after only two days. Nasogastric tubes are not and were not ever inserted in one patient and then used again in another patient.

      9.     Currently only 10 french (3 mm. in diameter) nasogastric tubes are used on all patients. Originally, 12 french (3.6 mm in diameter) tubes were used for most detainees receiving daily feedings. During a two-day period in September, 2005, 16 french (4.8 mm in diameter) tubes were used for a few patients when medical personnel at the detention hospital attempted to

implement a U.S. Bureau of Prisons protocol for higher volume feeding that would allow the detainees to remain in their cells for more of the day. This protocol involved the insertion of the feeding tube twice per day, with the tube being sanitized before each insertion, but the protocol was abandoned after a two-day trial period, as it was determined that a protocol involving smaller tubes which remained in the patient for longer periods of time was more comfortable for the patients and was easier to manage for medical personnel. The 3 mm tubes are soft and flexible, and are in common use as nasogastric tubes in hospitals throughout the United States.

10.    Doctors and registered nurses carefully and continuously evaluate the health of all detainees being tube-fed. First, consistent with JTF-GTMO policy, detainees are counseled concerning the risks of not eating and alternatives to involuntary feeding. The counseling occurs on multiple occasions, including when a detainee has refused nine consecutive meals, prior to the onset of tube feeding, and at various times during the period of time the detainee chooses to be tube fed. Doctors and nurses monitor the detainees' health by both observation and medical testing. Each patient has a different ability to accept differing amounts of nutrition and hydration. As a result, medical professionals must continually evaluate the rates of nutrition and hydration and make observations on the success of the treatment regimen. In addition, blood tests are taken on a periodic basis and that laboratory data is also evaluated.

11.    Depending upon the location of the detainees, those that are hunger-striking get varying degrees of medical supervision. Those detainees that are patients in the detention hospital have a registered nurse and other medical personnel on site twenty four hours every day and are seen by a physician no less than once daily. For those detainees on Papa block, the special cell block for detainees who are being fed enterally, they have no restraints in their cells, are able to exercise daily and have a physician or registered nurse on site all day, every day. Those detainees who are not

receiving enteral feeding are seen daily by corpsmen, and can be seen anytime they request medical assistance through the guards.

12.     When a detainee under medical care is transported to Camp Echo, he may be transported in various types of vehicles.  Before allowing the detainee to be moved to Camp Echo, medical personnel evaluate the detainee's condition at the time to determine that the detainee can be moved safely and without compromise of his medical condition.  In some cases, an ambulance is used.  On two occasions, an ambulance and stretcher were used because wheelchairs and wheeled walkers are difficult to use on the gravel pathways at Camp Echo.  On only one occasion was a corpsman detailed to accompany the patient to Camp Echo and remain in the area if needed.  This precaution was based on the detainee's medical status as evaluated at the time.

13.     In some cases an intravenous route is used for re-hydrating hunger striking patients that are not to the point that they need enteral feedings.  As the condition of each detainee patient is evaluated, a medical professional may determine that hydration is necessary.  This treatment, performed in the detention hospital is, again, always done by either a registered nurse or a doctor.  As with any intravenous treatment, minor local swelling does occur from time to time, but there have been no medical complications from any intravenous feeding of a hunger-striking detainee. Once the detainees are on enteral feedings, all hydration that is necessary can be provided through the feeding tube.

14.     Experience teaches that, whenever nasogastric tubes are used, there may be occasional minor bleeding and nausea as a result.  This medical procedure requires that a foreign object be inserted into the body and, ideally, remain in it.  The patients are all offered pain relievers if they are in discomfort.  Many patients do not request or need pain relievers.  If required, non-narcotic pain relievers such as ibuprofen are usually sufficient.  In rare instances, narcotic pain relievers have been used.  During the course of the entire hunger strike, there have not been any serious problems or

6

complications, including any serious bleeding or vomiting, from the utilization of the nasogastric

feeding tubes. Occasional sores may occur in the throat, but those sores have not been severe and

have been treated. The sores have not kept the patients from talking or otherwise functioning within

the camp or the detention hospital. In all of the procedures done in order to feed patients enterally

during the hunger strike, only one patient has passed out, and that was due to hyperventilation. That

patient, who is not one of the petitioners, had no long-term impact from fainting.

     15.    The actual feeding process, both at the detention hospital and on the cell block, is

very voluntary. Detainees retain a large measure of control over the administration of the nutrition.

Once the feeding tube is inserted (or if it has remained in the detainee) a bag is connected to the tube

and the nutrition flow begins. The detainee himself controls the flow of the nutrition so that any

discomfort is minimized. The entire feeding process for most detainees takes approximately two

hours. The feeding process on the cell block is similar. The detainees within their cells come

voluntarily to the door and hand their nasogastric tube out to a nurse, who connects the bag of

nutrition to the tube and hangs the bag connected to the tube on a hook outside the cell door. Then

the detainee initiates and controls the flow of nutrition until the feeding is completed. The length of

the tube allows the detainee to move about within his cell during the two hours of feeding. During

Ramadan, just as with regular meals provided to other detainees, the enteral feedings for hunger

strikers are done before dawn and after sunset to accommodate any detainee's desire to maintain his

religious fast.

     16.    On October 1, 2005, after meeting with his lawyer earlier in the day, ISN 114 removed

his feeding tube and incited seven other detainees on Papa block with feeding tubes to do the same. As an

explanation for why he removed his feeding tube, ISN 114 reported that his lawyer told him that the

government does not have any right to force feed the detainees. In response to this situation, which

created significant problems on the cell block, on October 2, 2005, one of my physicians met with the

detainee patients and explained again why involuntary feeding was being done and that the involuntary feeding was authorized through a lawful order of a higher military authority. Additionally, the physician provided one detainee who could speak and read English a copy of a recent court order that cited the procedures outlined in General Hood's declaration with approval.

17.    At one point during September, 2005, ISN 114 was moved to the new, as of yet unoccupied, psychiatric wing of the detention hospital. This move was done only because there was a need for space within the hospital and the psychiatric wing is an available overflow medical care facility within the camp. With regard to the specific condition of ISN 114, he is stable and his prognosis is good. He has been a hunger striker since 11 August and has been fed enterally since 25 August 2005. He now resides on Papa block, has no restraints in his cell and voluntarily leaves his feeding tube in place. Previously, he had been in the detention hospital and was released and returned to the cell block with his feeding tube removed for two days in September in an effort to encourage him to eat. He was offered food and water during that time. However, after refusing to eat for two days, ISN 114 was returned to the detention hospital, re-hydrated and his enteral feeding was then resumed. While ISN 114 has had demonstrable weight loss due to his choice to participate in the hunger strike, he has had no serious complications and is able to talk, walk and even participates in scheduled recreation three times per week.

18.    I am also familiar with the condition of ISN 440. He, too, is stable and his prognosis is good. He chose to participate in the hunger strike on 9 August and has been fed enterally since 25 August. Although he, too, has had a demonstrable weight loss due to his choice to hunger strike, 440 is still capable of all necessary physical activity, including incidents when he has stood on his bed and shouted derogatorily at medical personnel on the same day that he was reported by his counsel to be unable to walk or talk.

19.    Guards are not permitted to, and do not, physically or verbally harass the detainee patients receiving enteral feedings, either in the detention hospital or on the cell block.  Their presence in the detention hospital is solely to ensure the safety and security of both the detainees and medical staff.  For all detainees, medical care that is needed is never withheld to gain cooperation or for any other reason.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: October 19, 2005

_John S. Edmondson_
JOHN S. EDMONDSON, M.D.