Approved for Public Filing by C.S.O.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ABDUL HAKIM ABDUL KARIM AMIN BUKHARI, | : | CIVIL ACTION |
| Petitioner, | : | (Habeas Corpus) |
| v. | : | |
| GEORGE W. BUSH, *et al.*, | : | |
| Respondents. | : | No. 1:05-cv-01241(RMC) |

**PETITIONER'S OPPOSITION TO *RESPONDENT'S MOTION FOR PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS AND REQUEST FOR EXPEDITED BRIEFING***

Without notice to counsel or court approval, Respondent's have unlawfully seized privileged attorney-client materials from Petitioner without justification. These seizures were in blatant violation of the protective order entered by this Court. Respondents now ask this Court to allow a "filter team" of government lawyers to review Mr. Bukhari's privileged materials, with no showing that such action would assist their investigation. The Court should deny the motion and sanction the government for violating the protective order, for seizing and reviewing the privileged communications without prior approval of the Court and notice to counsel, and for failing to report its actions to the Court and counsel until nearly a month after the fact. Petitioner further requests that the Court order that the government return Mr. Bukhari's confidential papers to him forthwith.

On June 10, 2006, the military reported that three prisoners at Guantánamo Bay had been

found dead in their cells.  The military reported the prisoners' deaths as suicides.  Now, nearly a *month* later, the government has disclosed that, between June 10 and June 14, as part of the purported "investigation," NCIS seized and examined over a half-ton of written communications between Guantánamo prisoners and their lawyers.  The government claims that it seized the prisoners' legal papers because notes found in the cells of the dead prisoners suggested that the prisoners might have used the cloak of the attorney-client privilege in furtherance of a suicide "plot" by the prisoners, and were perhaps "encouraged, ordered, or assisted by third parties." *Respondent's Motion for Procedures Related to Review of Certain Detainee Materials and Request for Expedited Briefing* (hereinafter *Respondent's Motion*), Harris Decl. ¶ 4.

The government seized and examined at least some of these privileged communications over a five-day period without court approval or supervision, and without prior notice to the prisoners' counsel, and then waited nearly a month before disclosing its actions to the Court and counsel.  The government's seizure and examination of these materials violated not only this Court's orders directing the government to respect the attorney-client privilege but also the Protective Order entered by this Court to ensure the protection of that privilege.

Having belatedly disclosed its illegal seizure and examination, the government now asks the Court to condone its actions and permit it to retain the seized materials and examine them even more closely.  It comes as no surprise that the government sought judicial sanction for its actions only after habeas counsel, informed of the government's actions by their clients, began to seek relief from the Court.[1]

---

[1]   Mot. To Modify Stay To Direct Resp'ts To Return Impounded Privileged Legal Material and for Other Relief, <u>Abdullah v. Bush</u>, No. 05-00023(RWR) (filed July 5, 2006).  The government

The fact that Guantanamo detainees legal papers were seized over a five-day period demonstrates that no exigent circumstances required the government to act without first seeking the approval of the Court and notifying counsel. At the very least, a conference call with counsel and the Court on June 10, the day of the prisoner deaths, could have been arranged. The Department of Justice either approved the military's seizure of privileged legal materials without notice or court approval, or failed to have in place procedures to prevent what happened from occurring. The Department's failure to disclose the government's actions until the Abdullah motion forced its hand suggests that the Department was a full partner in the military's breach of the privilege. The Court should sanction the government for its unilateral, illegal conduct.

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Its purpose is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998); see also Lanza v. State of New York, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection."). As the District Court has recognized in the context of the Guantánamo litigation, "[t]he privilege that attaches to communications between counsel and client has long held an exceptional place in the legal system of the United States." Al Odah v. U.S., 346 F. Supp. 2d 1, 10 (D.D.C. 2004).

Nowhere is the effectuation of the privilege more important than in the context of pre-

---

states that its instant motion is an opposition to the Abdullah motion. *Respondent's Motion* at 1, n.1.

trial detention. "An inmate's need for confidentiality in his communications with attorneys through whom he is attempting to redress his grievances is particularly important." Bach v. Illinois, 504 F.2d 1100, 1102 (7th Cir. 1974); see also Johnson-El v. Schoemehl, 878 F.2d 1043, 1051 (8th Cir. 1989) ("Pretrial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials. When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised"). For such prisoners, "contact with an attorney and the opportunity to communicate privately is a vital ingredient to the effective assistance of counsel and access to the courts." Bach, 504 F.2d at 1102. Even for prisoners convicted of crimes, the Supreme Court has held, "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right to access to the courts are invalid." Procunier v. Martinez, 416 U.S. 396, 419 (1974).

Seizure of legal papers is particularly egregious because it strikes at the heart of the attorney-client relationship and interferes with the inmate's access to the courts. "The taking of legal papers will often (though perhaps not always) interfere with an inmate's right of access to the courts. . . . [T]he destruction or withholding of inmates' legal papers burdens a constitutional right, and can only be justified if it is reasonably related to a legitimate penological interest." Goff v. Nix, 113 F.3d 887, 892 (8th Cir. 1997) (internal citations omitted).

The government's vague allegations of notes found in a dead prisoner's cell written by another prisoner cannot qualify as a "legitimate penological interest" in seizing *all* legal documents from *all* prisoners. Indeed, Mr. Bukhari is currently housed in Camp 5 (upon information and belief). Thus, the seizure of his documents to somehow investigate suicides in

4

Camp 1 is a farce.[2] Seizing legal papers interferes with a prisoner's access to courts and chills the giving, receiving, and continued possession of communications from attorney to client, particularly when seized without notice to the prisoners' attorneys or the court.

    The District Court has recognized that the prisoners held at Guantanamo – who have not been tried and who seek the opportunity through their counsel to challenge the basis of their detention – have a right to counsel and are entitled to a confidential relationship with their counsel. Over the government's objections, "[t]he Court [found] that Petitioners are entitled to be represented by counsel." Al Odah, 346 F. Supp. 2d at 5. Thus, "the Court determine[d] that the government is not entitled to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communications between them." Id. Nonetheless, the government has decided "to unilaterally impose procedures that abrogate the attorney-client relationship and its concomitant attorney-client privilege covering communication between them." Id.

    To give meaning to the attorney-client privilege in this context, the Court implemented Access Procedures which created avenues of confidential communication between prisoners and their attorneys by laying the ground rules for in-person meetings, and for written communication between these parties. The government sought the ability to monitor these communications, but that request was squarely rejected by the Court.

    The government's actions violated the Protective Order and accompanying Access

---

[2]     Josh White, "Three Detainess Commit Suicide at Guantanamo," The Washington Post, June 11, 2006, at A1 ("Guards found the three men unresponsive and not breathing in their separate cells in Camp 1 ...").

Procedures.  The government does not attempt to justify its actions under the Protective Order, but rather admits that the seized materials "will likely include some number of attorney-client communications potentially subject to attorney-client privilege." *Respondent's Motion* at 9.  But the government's unilateral abrogation of the privilege would have been unlawful even if it had not directly violated a Court order.  Abrogation of the attorney-client privilege in any context requires the government to make a specific, *individualized* showing that there is sufficiently compelling justification for invading the privilege.  For example, where the government invokes the crime-fraud exception to the attorney-client privilege, it bears the burden of making an adequate showing that the exception applies – i.e., that *that* client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and actually carried out that act.  In re Sealed Case, 107 F.3d 46, 49 (D.C. Cir. 1997); see also Doe v. United States, 2003 WL 22879314 (2d Cir. Dec. 4, 2003) (reversing contempt order where government failed to meet burden of showing that crime-fraud exception applied); In re Richard Roe, Inc., 68 F.3d 38, 40 (2d Cir. 1995) (requiring a showing of probable cause to believe that a crime or fraud has been attempted or committed and that attorney-client communications were used to further that crime or fraud); In re Grand Jury Subpoenas Duces Tecum, 798 F.2d 32, 34 (2d Cir. 1986) (reversing civil contempt order because the government did not satisfy its burden of showing that the crime-fraud exception applied to the documents the corporation failed to produce).  Similarly, when the government seizes materials from a location that likely contains privileged papers, that seizure must be supported by probable cause and a warrant, and it still must employ appropriate means of screening out privileged materials.  See, e.g., United States v. Stewart, 2002 WL 1300059 (S.D.N.Y. June 11, 2002).

The government has not cited any cases that suggest the privilege may be invaded without an *individualized*, sufficiently rigorous showing that materials of a particular client are likely to have been used in furtherance of a crime.  Indeed, no showing at all has been made with respect to Mr. Bukhari, who was in an entirely different camp with no ability to communicate with the detainees who took their lives.

The Court should simply order that the government return Mr. Bukhari's privileged documents to him.  The government has made no particularized showing (or even a generalized showing for that matter) that he did anything wrong or was in any way involved in any suicide "plot."  As stated, upon information and belief, Mr. Bukhari is currently housed in Camp 5 and has been for quite some time.  He could therefore have had no contact with the deceased detainees.  The government's fishing expedition into his privileged papers must not be sanctioned by this Court.

If the Court decides - which it should not - that further review of the prisoners' legal papers is allowed, the use of a Department of Defense Filter Team is inappropriate.  Courts are appropriately reluctant to entrust attorney-client privileged materials to such governmental teams.  Indeed, "the use of government taint teams has often been questioned or outright rejected by the courts."  In re Search of the Scranton Hous. Auth., 2006 WL 1722565, at *5 (M.D. Pa. Jun. 22, 2006).  See, e.g., Black v. United States, 172 F.R.D. 511, 516 (S.D. Fla. 1997) (even though government needed documents to pursue escaped fugitive, court rejected proposed "taint team" and ordered that "a United States district judge or his designee" would review documents for privilege); United States v. Abbell, 914 F. Supp. 519, 520–21 (S.D. Fla. 1995) (appointing special master rather than filter team to review potentially privileged documents obtained by


search warrant).

Just last week, the Sixth Circuit overruled a district court's decision to permit review of potentially privileged documents by an independent government "taint team" because the review posed unacceptable risks to the attorney-client privilege. In re Grand Jury Subpoenas 04-124-03 and 04-124-05, ___ F.3d. ___, 2006 WL 1915386 (6th Cir. July 13, 2006). Moreover, "at least three courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better." United States v. Stewart, No. 02 CR 396, 2002 WL 1300059, at *6 (S.D.N.Y. June 11, 2002).

Here, "there is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness." United States v. Neill, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997). Concerns about the appearance of propriety are especially important here, given the difficulties that counsel has experienced in gaining the prisoners' trust. Before meeting with counsel in the aftermath of Rasul v. Bush, 542 U.S. 466 (2004), the prisoners had "been detained virtually incommunicado for nearly three years without being charged with any crime." Al Odah, 346 F. Supp. 2d at 12. Moreover, "Petitioners face an obvious language barrier, have no access to a law library, and almost certainly lack a working knowledge of the American legal system." Id. Worse, as a result of statements from interrogators and other government personnel, many Petitioners suspect that their civilian attorneys are simply guards or interrogators in disguise. See, e.g., Charlie Savage, "Guantánamo Detainees Find Fault with Lawyers," Boston Globe, Aug. 10, 2005, at A1. These suspicions will only intensify when Petitioners learn that their attorney-client materials are being reviewed by lawyers for the military that detains and interrogates them.

It is quite clear that the government's motion is simply another attempt to chill attorney-client communications without justification. From the very beginning, the government has been quite unhappy that detainees are permitted communications with their attorneys at all. Indeed, in its motion, the government suggests that "possibly others" – *i.e.*, non-prisoners – may have participated in a "manifest abuse of the legal mail system." *Respondent's Motion* at 10. This unfounded assertion is a veiled threat to habeas counsel, designed to deter them from communicating effectively with their clients. Buried in a footnote is the government's conclusion that because counsel is prohibited "from sharing . . . certain types of materials with detainees . . . [if] prohibited materials are discovered in the course of review, the Filter Team would not be constrained from bringing the matter to the Court's attention for appropriate action." Id. at 11, n.10. Habeas counsel with access to classified information are aware that they work under the shadow of possible contempt and criminal actions. Those with access to classified legal papers, including three of the undersigned Assistant Federal Defenders, have security clearances, and are officers of the Court.

**Conclusion**

In unilaterally confiscating confidential, privileged legal communications between undersigned counsel and Mr. Bukhari, the government violated the protective order and should be held accountable. Moreover, this Court should order the government to return Mr. Bukhari's documents to him immediately.

                    Respectfully Submitted,

                    /s/Billy H. Nolas
                    Billy H. Nolas (DC 399275; PA 83177)
                    Assistant Federal Defender
                    Maureen Rowley (PA 33020)
                    Chief Federal Defender
                    David McColgin (PA 42963)
                    Supervising Appellate Assistant Federal Defender
                    Cristi Charpentier (PA 62055)
                    Shawn Nolan (PA 56535)
                    Mark Wilson (PA 26887)
                    Assistant Federal Defenders
                    Federal Community Defender Office for the
                    Eastern District of Pennsylvania
                    601 Walnut Street, Suite 545 West
                    Philadelphia, PA 19106
                    (215) 928-0520; (215) 928-1100

Dated:   July 21, 2006

Certificate of Service

    I hereby certify that a true and correct copy of the foregoing instrument has been served via the e-filing system on the following counsel of record for respondents:

Mr. Terry Henry
Ms. Preeya M. Noronha
US DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 7226
Washington, DC 20529-0001


        /s/Billy H. Nolas
        Billy H. Nolas


Dated: July 21, 2006