PREVIOUSLY FILED WITH CSO AND
CLEARED FOR PUBLIC FILING

IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA

_____
:
**ABDUL HAKIM ABDUL KARIM**
**AMIN BUKHARI**                              :
Guantanamo Bay Naval Station,
Guantanamo Bay, Cuba                      :     CIVIL ACTION
      Petitioner                             :     (HABEAS CORPUS)
                                                         :
   V.                                             :
                                                         :     No:     05-CV-01241 (RMC)
**GEORGE W. BUSH, et. al.**              :
      President of the United States
      The White House                    :
      1600 Pennsylvania Avenue, N.W.
      Washington, D.C. 20500;            :
                                                         :
_____

**PETITIONER'S MOTION TO MAINTAIN STAY
AND HOLD PROCEEDINGS IN ABEYANCE**
_____

Petitioner, Abdul Bukhari, through his attorneys, hereby moves that this Court stay all proceedings in the matter in the District Court and hold the case in abeyance pending exhaustion of Petitioner's remedies under the Detainee Treatment Act of 2005 and pending resolution of the jurisdictional issues. Respondents oppose this motion. Petitioner also hereby notifies the Court of his intention to file a Petition pursuant to the Detainee Treatment Act of 2005 ("DTA") with the Court of Appeals for the District of Columbia and avers the following:

I.      **THE COURT SHOULD HOLD HABEAS PROCEEDINGS IN ABEYANCE.**

This Court ordered that all action in Mr. Bukhari's habeas proceedings be stayed on December 21, 2005, pending the outcome of the consolidated appeals in Khalid v. Bush et al., 355 F.Supp2d 311 (D.D.C. 2005), appeals docketed sub nom., Boumediene v. Bush et al., Nos. 05-5062, 05-5063 (D.C. Cir. March 3, 2005) and In re Guantanamo Detainee Cases, 355 F.Supp.2d 443 (D.D.C. 2005), appeals docketed, Nos. 05-5064 et al. (D.D. Cir. March 7, 2005). The Court of Appeals has now ruled that the Court lacks jurisdiction because of the passage of the DTA. See Boumediene v. Bush, 476 F.3d. 981 (C.A.D.C. 2007). Petitioner is now in the process of instituting proceedings in the Court of Appeals pursuant to the DTA. However, Petitioner requests that this Court maintain the stay and hold proceedings in abeyance in this Court pending exhaustion under the DTA and pending a final resolution of the jurisdictional question by the United States Supreme Court. There is no other way to preserve Petitioner's constitutional rights.

   A.   **Where A Federal Habeas Petition Has Been Filed, And A Potential Remedy Remains To Be Exhausted, The Supreme Court Has Approved – And Under Circumstances Present Here Required – The Procedure Of Entering An Order Staying The Federal Habeas Proceeding And Holding The Case In Abeyance While The Potential Remedy Is Exhausted.**

In Rhines v. Weber, 544 U.S. 269 (2005), the Supreme Court explicitly approved the stay-and-abey procedure in the context of federal habeas corpus proceedings. In that case, the prisoner had filed a mixed habeas petition in federal court – one containing both claims exhausted through the state court system and unexhausted claims. Given the major procedural risks of a dismissal order, the Court found that District Courts have discretion to enter stay-and-abey orders in the federal habeas case while the unexhausted claims are presented to the

state court. Under this procedure, the federal habeas corpus case is stayed and held in abeyance for a reasonable time while available state remedies are exhausted.

Under Rhines when three preconditions are met, the issuance of a stay-and-abey order is, in effect, mandatory. In the absence of intentional dilatory tactics by the petitioner, "it would likely be an abuse of discretion to deny a stay and to dismiss" a petition if the petitioner has good cause for the failure to exhaust and the unexhausted claims are potentially meritorious. Rhines, 544 at 278; accord Pace v. DiGuglielmo, 544 U.S. 408, 416-17 (2005). The three conditions under which failure to stay-and-abey would constitute an abuse of discretion are (1) no deliberate delay, (2) good cause, and (3) potentially meritorious claims. These conditions are easily met in this case.

First, the petitioner has done nothing to delay and everything to accelerate this case. The stay that has kept his case inactive, except for issues relating to access and attorney-client relations, resulted from the government's motion eighteen months ago. The District Court filed the petitioner's *pro se* submission as a petition for habeas corpus relief on June 22, 2005. Throughout the pleadings, the petitioner has repeatedly invoked the need for habeas relief to be prompt. Unlike the death penalty cases that caused the Supreme Court concern in Rhines, every day of delay is disastrous for the petitioner.

Second, there is good cause for the failure to exhaust: the potential remedy did not exist until after the habeas corpus petition was filed and did not purport to provide the habeas relief to which the petitioner was entitled at the time the habeas action was filed. In Pace, the Court noted that potential confusion regarding state remedies required equitable protections. 544 U.S. at 416. Those complexities are nothing compared to what Guantanamo detainees face. The questions

left open in the Supreme Court's decision in Rasul v. Bush, 542 U.S. 466 (2004), which established a right to proceed under § 2241 at the time the petitioner submitted his documents, and the subsequent Detainee Treatment Act of 2005 and Military Commission Act of 2006, have resulted in major complexities, many of which are still unresolved.

Third, the claims raised both in this Court and the DTA petition are meritorious. The extraordinary factual development in this case establishes that Petitioner is not an enemy combatant. Petitioner is also alleging numerous violations of the Department of Defense's own standards and procedures as well as the laws and Constitution of the United States. In the event the case is remanded, or if the DTA procedures prove an inadequate substitute for constitutionally-required habeas corpus procedures, this Court should be in position to proceed immediately on the issues raised and briefed.

Under the controlling authority of Rhines, the Court should enter an order staying the case, as it has been stayed to date, and holding the disposition of the merits in abeyance pending the outcome of the Petitioner's litigation under the DTA.

### B. Maintenance Of The Status Quo Is Necessary For Adequate Exhaustion Of The DTA Proceedings In The Court Of Appeals.

The Respondents oppose the motion for a stay-and-abey order. In the statement accompanying the Boumediene order, two Justices stated: "Were the Government to take additional steps to prejudice the position of petitioners in seeking review in this Court, 'courts of competent jurisdiction,' including this Court, 'should act promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised.'" 2007 WL 957363 (Justices Stevens

and Kennedy, statement respecting the denial of certiorari).[1] Any government action to limit the current level of access by counsel to the petitioner severely prejudices both the DTA action and the habeas litigation. This Court should carefully protect the status quo by granting the stay-and-abey order to assure the petitioner is not prejudiced in his ability to litigate the DTA action and to preserve potential remedies before this Court.

The development of the necessary facts and the need for client consultation are basic to the attorney-client relationship. Under the ethical rules, the client must have the opportunity to advise the attorney of relevant facts, to provide direction in the litigation, and to participate in tactical and strategic decisions. To accomplish these ethical obligations under the circumstances of Guantanamo detention has been a challenge.[2] Any disruption of the status quo would severely injure the petitioner's ability to litigate the DTA proceedings and to maintain his separate claims for relief that are pending before this Court.

This Court has pending many pleadings regarding the Court's jurisdiction and authority to grant relief to the petitioner. The denial of certiorari in Boumediene leaves unanswered predicate questions necessary to deciding the issues before the Court including: Does the DTA provide a forum for resolving issues regarding unlawful detention coextensive with traditional habeas corpus? If not, has the writ been unconstitutionally suspended or eliminated? Is the government taking "additional steps to prejudice the position of petitioners in seeking review of this Court"

---

[1] Quoting Padilla v. Hanft, 547 U.S. 1062 (Kennedy, J., concurring in the denial of certiorari).

[2] This Court received briefing and argument regarding these difficulties during the litigation of the filter team motion that resulted in the Court's decision in Boumediene v. Bush, 450 F.Supp.2d 25 (D.D.C. 2006).

and, if so, should this Court "act promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised"?

On the underlying questions regarding elimination of the writ of habeas corpus, because the constitutional question is contingent on the effectiveness of the DTA procedures, this Court has jurisdiction to determine its own jurisdiction. Kircher v. Putnam Funds Trust, 126 S.Ct. 2145, 2155 (2006) (a federal court's adjudicatory authority includes "its authority to determine its own jurisdiction"); see also Ex parte Milligan, 71 U.S. 2, 118, 131 (1866)(Court reviewed the underlying facts to determine that the predicates for military jurisdiction were lacking and granted writ of habeas corpus). The Court has insufficient information to answer a number of questions the DTA proceedings will answer.  Further, if this Court eventually reaches the jurisdictional and constitutional questions, and rules adversely to the petitioner, the Court must provide an adequate record for appellate and Supreme Court review, which requires that the present case remain in place until after the petitioner has exhausted the DTA procedures.  During that process, the government should be foreclosed from prejudicing the petitioner's ability to litigate – at the District Court or Circuit Court level – these questions of obvious and historical importance.

II.  **THE DETAINEE TREATMENT ACT (DTA) AND MILITARY COMMISSIONS ACT (MCA) HAVE NOT STRIPPED THIS COURT'S JURISDICTION. [3]**

  A.  **Respondents' Construction Of The DTA and the MCA Would Violate The Constitution's Prohibition Against Bills Of Attainder.**

---

[3] Petitioner acknowledges that the Court of Appeals has ruled that the DTA stripped the Court of Jurisdiction in Boumediene, supra.  Petitioner submits that the Court's ruling is wrong - it is in contradiction with United States Supreme Court precedent - and will eventually be overturned.  Petitioner includes these arguments herein to properly preserve these issues for appellate review in his case.

The DTA and MCA amendments to § 2241, customized to deny habeas and other court access to a small, distinct, and unpopular group, is a classic Bill of Attainder prohibited by Article I, § 9, clause 3, of the Constitution ("No Bill of Attainder . . . shall be passed."). It is precisely this type of "deprivation of any rights, civil or political," including "the privilege of appearing in the courts," especially when imposed on a disfavored minority, that has been condemned by the Supreme Court. Cummings v. Missouri, 71 U.S. 277, 320 (1866); accord United States v. Brown, 381 U.S. 437, 445-47 (1965).

To qualify as a Bill of Attainder, a legislative enactment must (1) apply with specificity to an identified individual or group, and (2) impose punishment. Foretich v. United States, 351 F.3d 1198, 1217 (D.C. Cir. 2003). The element of specificity is satisfied if a statute singles out a person or class by name or applies to "easily ascertainable members of a group." United States v. Lovett, 328 U.S. 303, 315 (1946).

The target group of the DTA and MCA is any "alien detained by the Department of Defense at Guantánamo Bay, Cuba." DTA, Section 1005(e)(1). These individuals could not be more discretely identified: the only persons detained at the detention camp are those whom the Executive Branch puts there. The individuals to whom the legislation applies are the named persons who have petitioned for habeas relief, the as yet unnamed John Doe detainees at Guantánamo Bay, and any others held at the Guantánamo Bay prison camp. The DTA and MCA easily meet the specificity criterion for classification as a Bill of Attainder.

The Acts also easily meet the punishment requirement for a Bill of Attainder. From the time of Chief Justice Marshall, the scope of forbidden punishment falling within the attainder prohibition has included banishment, deprivation of the right to vote, corruption of blood, and

confiscation of property. <u>Foretich</u>, 351 F.3d at 1217. Following the Civil War, Congress and the States enacted legislation aimed at persons who had rebelled against the United States, barring practice of certain professions without an expurgatory oath of loyalty. In <u>Cummings v. Missouri</u>, 71 U.S. 277 (1866), the Court freed a priest who ministered without swearing the oath, stating:

> <u>The deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact</u>. Disqualification from office may be punishment, as in cases of conviction upon impeachment. Disqualification from the pursuits of a lawful avocation, or from positions of trust, <u>or from the privilege of appearing in the courts</u>, or acting as an executor, administrator, or guardian, may also, and often has been, imposed as punishment.

71 U.S. at 320 (emphasis added). Similarly, in <u>Ex parte Garland</u>, 71 U.S. 333 (1866), loyalty oath legislation that barred an attorney from the courtroom was held to constitute a Bill of Attainder:

> As the oath prescribed cannot be taken by these parties, the act, as against them, operates as a legislative decree of perpetual exclusion. And exclusion from any of the professions or any of the ordinary avocations of life for past conduct can be regarded in no other light than as punishment for such conduct.

71 U.S. at 377. The Civil War cases make clear that Congress cannot legislate to the detriment of a group – irrespective of size – that is defined by the status of its members so as to permanently exclude them, on the basis of that status, from civil liberties ordinarily enjoyed by all.[4]

---

[4] In <u>Brown</u>, the Supreme Court found that the Bill of Attainder prohibition stemmed from separation of powers concerns:

> [T]he Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness, of, and levying appropriate punishments upon, specific persons.

Determination of the punitive aspect of legislation barred by the Bill of Attainder Clause analysis has included consideration of three factors: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" Foretich, 351 F.3d at 1218 (quoting Selective Service System v. Minnesota Public Interest Group, 468 U.S. 841, 852 (1984)). A statute need not satisfy all three factors to be a Bill of Attainder; they are merely factors to be considered. Id. at 852. "Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." Nixon v. Administrator of General Services, 433 U.S. 425, 475 (1977). The test is functional rather than dependent upon legislative labeling. Cummings, 71 U.S. at 325 ("The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name.").

Denial of equal access to the courts meets the historic definition of punishment. If exclusion from vocations constitutes punishment – including "appearing in the courts" as in Cummings – then barring a prisoner from bringing a claim for habeas relief before the district court can only be a punitive measure. This is especially true because the DTA and MCA's exclusion cripples the ability of Guantánamo detainees to attack the constitutional legitimacy of their confinement and destroys any opportunity they might otherwise have had in habeas litigation to develop facts to counter the one-sided record created in the Combatant Status Review Tribunal (CSRT). Consequently, as construed by Respondents, the DTA and MCA

---

Brown, 381 U.S. at 445.

ensure that Mr. Bukhari's detention will be prolonged and indefinite, a state of affairs which the Cummings Court – citing to Blackstone – listed as an historically-recognized form of punishment. 71 U.S. at 321 (quoting William Blackstone, 4 COMMENTARIES OF THE LAWS OF ENGLAND *377 (1769)). See also Lynce v. Mathis, 519 U.S. 433, 442 (1997) (discussing constitutional bases for the prohibitions on retroactive legislative action and removal of eligibility for a benefit as punishment).

The punitive aspects of the DTA and MCA, as a practical matter, are extreme. Imprisonment itself is punitive – whether brief or prolonged and regardless of the conditions. Brown, 381 U.S. at 458 (imprisonment regardless of its purpose is punishment). Here, Mr. Bukhari has been in onerous custody, virtually incommunicado, for more than three years. Given the length of custody and suffering Petitioner has endured, the continued indefinite detention is at the apex of punitive treatment. Zadvydas, 533 U.S. at 690.

The punitive reality of the new legislation accords with the animus toward the detainees that has been expressed by some members of both the Legislative and Executive branches. The detainees have been repeatedly pre-judged and characterized as "terrorists." This animus is especially anomalous in light of indications from the declassified CSRT proceedings that only a minority of detainees are alleged to have taken up arms against the United States, and very few belong to al Qaeda. See Mark Denbeaux, Report on Guantánamo Detainees: A Profile of 517 Detainees Through Analysis of Dept. of Defense Data, Seton Hall University of Law, Feb. 2006, *available at* http://law.shu.edu/news/ guantanamo_report_final_2_08_06.pdf.

Historically, members of political groups believed to present a threat to national security have been the "targets of the overwhelming majority of English and early American bills of

10

attainder." Brown, 381 U.S. at 453; see Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 137-38 (1810) ("[I]t is not to be disguised that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed."). Politically-suspect groups are most likely to draw the fire of legislative censure and condemnation. For a statute to be declared a Bill of Attainder, all that is necessary "is that the legislative process and the law it produces indicate a congressional purpose to behave like a court and to censure and condemn." Foretich, 351 F.3d at 1226. That is what has happened with the DTA and the MCA.

The nonpunitive purposes of the Acts are negligible compared to the punitive consequences. The statutory text of the DTA lacks any formal statement of purpose or findings regarding § 1005. The Guantánamo Bay detainee litigation raises critical questions which address the very heart of our Constitution's meaning in the real world. The protective order and its enforcement mechanisms have addressed the needs of national security sufficiently to allow the claims of Mr. Bukhari, who is beyond the jurisdiction of the military, to have his claims heard.

      **B.**      **Respondents' Construction Of The DTA and the MCA Constitute An Unconstitutional Suspension Of The Writ Of Habeas Corpus.**

The Hamdan opinion directly addressed concerns that the DTA resulted in an unconstitutional suspension of the writ of habeas corpus. 126 S. Ct. at 2769. The writ of habeas corpus, "[a]t its historical core, . . . has served as a means of reviewing the legality of Executive

detention, and it is in that context that the protections have been strongest." St. Cyr, 533 U.S. at 301. Permanent denial of access to the writ of habeas corpus for the Guantánamo Bay detainees is unprecedented and would constitute a suspension of the writ.

Even if the DTA and MCA were construed to abrogate jurisdiction under 28 U.S.C. § 2241, review would remain available in the district courts under the common law writ of habeas corpus. In Rasul and Hamdan, the Court engaged in lengthy discussions of Johnson v. Eisentrager, 339 U.S. 763 (1950). Rasul, 542 U.S. at 475-480. In Eisentrager, the six factors that militated against a right to the writ related "only to the question of the prisoners' constitutional entitlement to habeas corpus." Rasul, 542 U.S. at 476. The Supreme Court observed that the Court of Appeals in Eisentrager had found a constitutional right to the writ protected by the Suspension Clause. 542 U.S. at 477. "In essence, the Court of Appeals concluded that the habeas statute ... had created an unconstitutional gap that had to be filled by reference to 'fundamentals.'" 542 U.S. at 478.

Nowhere in the Supreme Court's discussion is there any indication that a "fundamental" non-statutory (*i.e.* constitutional) right to petition for habeas relief does not exist. The Supreme Court noted the constitutional basis for seeking habeas relief in St. Cyr:

> In sum, even assuming that the Suspension Clause protects only the writ as it existed in 1789, there is substantial evidence to support the proposition that pure questions of law like the one raised by the respondent in this case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus.

533 U.S. at 304-05. The Court expressly rejected the government's position that habeas can be eliminated by statute: "[A] serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges

and provided no adequate substitute for its exercise." St. Cyr, 533 U.S. at 305; see also Ex parte Yerger, 75 U.S. (8 Wall.) 85, 96 (1868) ("It would have been, indeed, a remarkable anomaly if this court, ordained by the Constitution for the exercise, in the United States, of the most important powers in civil cases of all the highest courts of England, had been denied, under a constitution which absolutely prohibits the suspension of the writ, except under extraordinary exigencies, that power in cases of alleged unlawful restraint, which the Habeas Corpus Act of Charles II expressly declares those courts to possess.").

The inherent power of the judiciary under Article III, the common law history of the writ imported into the Constitution in the Suspension Clause, and the checks on judiciary power given to Congress in Article I, provide a sound basis for recognition of a right to habeas review that cannot be nullified by the legislature. See Christopher A. Chrisman, Article III Goes to War: A Case for a Separate Federal Circuit for Enemy Combatant Cases, 21 JOURNAL OF LAW AND POLITICS 31 (Winter 2005).

### C. Respondents' Construction Of The DTA and MCA Violates The Due Process Clause Of The Fifth Amendment.

The Due Process Clause of the Fifth Amendment provides that "no person shall be . . . deprived of life, liberty, or property, without due process of law." This clause includes both procedural and substantive protections and requires equal protection of the laws. The government's interpretation of the DTA runs afoul of these concepts.

#### 1. Legislation Based On Alienage Violates Mr. Bukhari's Right To Equal Protection Of The Laws.

The Fifth Amendment's guarantee of due process incorporates the Fourteenth Amendment's equal protection clause. Bolling v. Sharpe, 347 U.S. 497, 498-500 (1954).

Although the government retains the power to classify, particularly in the area of economics and social welfare, classifications "based on alienage . . . are . . . subject to close judicial scrutiny." Graham v. Richardson, 403 U.S. 365, 372 (1971).  In Rasul, the Supreme Court found that § 2241 applied equally to United States citizens and to aliens held at Guantánamo Bay: "Considering that the statute draws no distinction between Americans and aliens held in federal custody, there is little reason to think that Congress intended the geographical coverage of the statute to vary depending on the detainee's citizenship."  542 U.S. at 481.

       The DTA, by its plain terms, strips aliens detained at Guantánamo of access to the courts, while maintaining the rights of United States citizens to such access (". . . an application for a writ of habeas corpus filed by or on behalf of an *alien* . . . or . . . any other action . . . relating to any aspect of the detention of an *alien*. . . .").  Section 1005(e)(1) (emphasis added).  The DTA's new statutory distinction based on alienage, regardless of legal status, violates the guarantee of equal protection under law.

       The restriction on access to the courts based on national origin requires strict scrutiny for two reasons.  First, discrimination based on alienage is inherently suspect.  Disparate treatment of persons based on their alienage, without respect to legal status, is generally prohibited as a classification based on national origin.  Plyler v. Doe, 457 U.S. 202, 214 (1982) (Fourteenth Amendment's phrase "person within its jurisdiction" "sought expressly to ensure that the equal protection of the laws was provided to the alien population."); Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886) ("The fourteenth amendment to the constitution is not confined to the protection of citizens. . . .  [Its] provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and

the equal protection of the laws is a pledge of the protection of equal laws."). By limiting the habeas-stripping provisions to aliens, the DTA recognized the District of Columbia district court's continued § 2241 jurisdiction over United States citizens at Guantánamo Bay.

Second, discrimination regarding a fundamental right, such as access to the courts, triggers heightened protections. Tennessee v. Lane, 541 U.S. 509, 529 (2004) (right of access to the courts "call[s] for a standard of judicial review at least as searching, and in some cases more searching, than the standard that applies to sex-based classifications"); Romer v. Evans, 517 U.S. 620, 633 (1996) ("Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance."). Strict scrutiny is also required because the target group of aliens is de facto Muslim, which implicates equal protection as well as First Amendment concerns. Church of the Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 542 (1993). Constitutional and statutory prohibitions on arbitrary detention and torture mean little without a judicial remedy, especially where a suspect class is the target.

Congressional hostility toward the Guantánamo detainees and prejudgment of the merits of their claims does not provide a rational basis for discrimination against them. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." United States Department of Agriculture v. Moreno, 413 U.S. 528, 534 (1973).

15

### 2. Indefinite Detention And Unredressable Torture Violate Substantive Due Process.

In considering the constitutionality of the authorization for detention contained in 8 U.S.C. § 1231(a)(6) (1994), the Supreme Court stated in <u>Zadvydas</u>:

> A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law.' Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that Clause protects.

533 U.S. at 690. The Court ultimately resolved the case by interpreting the statute to forbid indefinite detention. Identical concerns arising out of the substantive liberty component of the Due Process Clause apply here. Should the Court accept Respondents' interpretation of the statute, it would be required to address the due process question raised, but avoided, in <u>Zadvydas</u> and <u>Martinez</u>.

The substantive due process issues are even more acute here because of the Guantánamo detainees' claims of torture and mistreatment. Respondents make the Orwellian claim that the DTA bars torture while at the same time depriving torture victims of meaningful access to the courts. The moral identity of our Republic, as well as its prestige abroad, is compromised by this position, which implicates substantive due process. <u>Rochin v. California</u>, 342 U.S. 165, 167-73 (1952).

### 3. The DTA and MCA's Limitations On Judicial Review Violate Procedural Due Process.

The DTA and the MCA offer no other substantive procedural protections than those found to be constitutionally inadequate by the district court in <u>In re Guantánamo Detainee Cases</u>,

355 F. Supp. 2d 443, 468 (D.D.C. 2005). In reliance on Hamdi v. Rumsfeld, 542 U.S. 507 (2004), the district court found that the failure of the CSRT process not only to provide detainees access to the material evidence upon which the CSRT affirmed "enemy combatant" status but also to permit the assistance of counsel were general procedural defects rendering the proceedings unconstitutional. See In re Guantánamo Detainee Cases, 355 F. Supp. 2d at 465-72. In Hamdan, the Supreme Court emphasized the need for procedural regularity in military proceedings involving loss of liberty. 126 S. Ct. at 2786-2798. The published transcripts of 360 CSRT and ARB proceedings illustrate the systemic inadequacies of the process.

The District Court has also found that reliance on coerced statements and a vague and overly broad definition of "enemy combatant" were specific defects of the process. See In re Guantánamo Detainee Cases, 355 F. Supp. 2d at 473. With the exception for use of coerced evidence, the DTA does not address, much less overcome, these deficiencies. The only "improvement" in the CSRT process purportedly provided by the DTA is the requirement of consideration of the "probative value" of coerced statements. Section 1005(b)(1). Even that provision is inconsistent with the Convention Against Torture, which the State Department has expressly admitted applies to CSRT and ARB proceedings. In addition, the DTA prohibits reconsideration of any past determination of "enemy combatant" status derived from coerced statements. Section 1005(b)(2).[5] Consequently, the "improvement" purportedly provided by

---

[5] The due process inadequacies of the DTA are in stark contrast to the rules of procedure established in the Alien Terrorist Removal Court of the United States. There, suspected terrorists are afforded a myriad of procedural due process rights before they may be removed from the United States, including neutral judicial involvement, access through appointed counsel to classified evidence, discovery, proof by a preponderance of terrorist status, and significantly, appellate rights. 8 U.S.C. §1531 et seq. Alleged terrorists facing removal are further entitled to consideration for release pending removal, and review of detention at least every six months.

Section 1005 of the DTA is illusory. Where, as here, the established procedures are unconstitutional, judicial oversight through habeas corpus is even more critically important.

**WHEREFORE**, for all of the foregoing reasons, Petitioner respectfully requests that this Honorable Court maintain the stay and hold habeas corpus proceedings in abeyance pending exhaustion under the DTA and a final resolution of the question of this Court's jurisdiction.

Respectfully submitted,

/s/Billy H. Nolas
Billy H. Nolas (DC 399275; PA 83177)
Assistant Federal Defender
Maureen Rowley (PA 33020)
Chief Federal Defender
David McColgin (PA 42963)
Supervising Appellate Assistant Federal Defender
Cristi Charpentier (PA 62055)
Shawn Nolan (PA 56535)
Mark Wilson (PA 26887)
Assistant Federal Defenders
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520; (215) 928-1100

Dated: April 11, 2007

Certificate of Service

    I hereby certify that a true and correct copy of the foregoing instrument has been served on Respondents through the Court Security Officer in accordance with the Standard Protective Orders:

Mr. Terry Henry
US DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 7226
Washington, DC 20529-0001

/s/Billy H. Nolas
Billy H. Nolas

Dated:  April 11, 2007